We'll hear argument first this morning in Case 17-949, Sturgeon v. Frost. Mr. Findley. Thank you. Mr. Chief Justice, and may it please the Court, Mr. Sturgeon is asking that this Court restore the balance that Congress struck when enacting ANILCA. ANILCA is unique and represents a series of bargains and compromises. A centerpiece of this balancing was ensuring that the over 18 million acres of non-public lands and waters about to be surrounded by the new ANILCA parks and preserves would not be subject to a new array of federal regulation. Section 103C of the statute preserved the status of these non-public lands and waters by excluding them from ANILCA's parks and preserves and specifically exempting them from park management regulation. I'm sorry, but ANILCA in many places puts statutory duties on the government, on the park service. So, for example, the statute expands the Glacier Bay National Monument. It says that the monument shall be managed for the following purposes, among others, to protect a segment of the Alsek River, fish and wildlife habitats, and migration routes, and a portion of the fair weather range. Or take another example. ANILCA creates the Kobik Valley National Park, which it says shall be managed for the following purposes, among others, to keep it in an undeveloped state. So the agency has a statutory duty to manage these parks for the purpose of maintaining the Kobik River, the Alsek River, and other rivers. If the park service can't do what you say, any regulation on these rivers, how can the secretary fulfill the statutory duties under ANILCA, unless it's under its organic powers? Anilca, as this Court recognized in the first decision, specifically invoked the Organic Act and said these parks shall be managed in accord with the Organic Act and in accord with the provisions of ANILCA. And this Court recognized that ANILCA carries many provisions specifically modifying the Park Services Organic Act authority, Section 103C being one of them. To your question, how can the park service fulfill its duties? In understanding ANILCA, it's understanding the debate about ANILCA. It was very important what land went into conservation system units, but it was equally important what land did not get included within conservation system units. ANILCA was not just a park enabling statute. As this Court recognized in AMICO when it was first addressed to ANILCA, it was resolving multiple land use disputes within Alaska. You haven't answered my question. Under your theory, the State manages all navigable waters between Federal lands or between State lands. And I mean not waters, but lands in terms of the territorial lands. How does the Park Service engage in its statutory obligations if it can't do what you say? The Park Service, for all those purposes, it can regulate submerged lands and waters where title did not pass to the State at Statehood. It can manage public waters. It can manage any non-navigable waters. There's no public waters. Under your theory, all the waters belong to the State. Only navigable waters where title of the submerged lands pass the State. All right. So what you're saying is that a good portion of the Act, with all of the preservations of the rivers that the Act imposes upon the Park Service, it cannot do any of that work. It cannot do that work on any of the specific navigable waters, but it can protect the watershed. The Yukon-Charlie is a very good example of that. The Yukon-Charlie, again, think of the balancing of ANILCA that this Court recognized. Some of its conservation purposes, it is equally important to balance the economic needs of the State of Alaska. The Yukon-Charlie met goal number one by putting 1.7 million acres of land into the preserve to protect lakes, streams, and the watershed. And you protect the river by regulating those 1.7 million acres of public lands. That's regulating the watershed that protects the river. Does it make any difference that a park is designated as a wild and scenic river? No, it does not, Your Honor. The Wild and Scenic Rivers Act was even specifically amended by ANILCA to make sure it wasn't covering State land that goes into the side of the river. And the Wild and Scenic Rivers Act itself recognizes State ownership of submerged lands. And the Wild and Scenic Rivers Act, there is nothing about those designations that undoes the central compromise that was through 103C. That's quite extreme. Kagan. And do you don't think it makes any difference if there are public lands on both sides of a river? In other words, both banks of a river are public lands, but still the Federal Government cannot regulate the river running through those lands? The Federal Government may, the Park Service may not. That was a power that was not delegated to the Park Service. An example that even the Park Service brings up in its brief is the Yukon-Cuscoquam Wildlife Refuge. There's a very specific provision directing that the Park Service may not impede access to these rivers, particularly in that area of Alaska where there are no roads. The Yukon and the Cuscoquam River are the arteries of commerce. That's how folks get to and from villages. That's how they go to vote. That's how they buy groceries. And the specific mandate in ANILCA is we are about to surround these highways with these Federal lands. We're going to put them in a conservation system unit. That's great, but please do not block access to the highway. And that's the point of exempting the rivers. So an agency like EPA is fully empowered to regulate the waters? Yes, Your Honor, that's exactly right. The EPA, the Coast Guard, any other Federal criminal law, all of these still apply. It's just simply that extra layer of Park Service regulation that was not supposed to apply once these lands and waters were surrounded by the Yukon. What does that do to your Federalism argument? Because at various times in your brief, you press Federalism concerns. But I'm wondering if those concerns have a lot of weight, if what you're really saying is not this agency, but that agency. When it comes to interpreting the Organic Act against Section 103C, those aren't necessarily implicated, although as this Court recognized in the first decision, the State's power over its navigable waters does raise significant issues of State sovereignty. And any time this Court addresses a case of navigable waters, the refrain rings throughout these cases that the State's ownership of the submerged lands and control and ownership of the resources within it is a hallmark of State sovereignty and a hallmark of Federalism. Where the clear statement rule comes into play is the Park Service's fallback argument here, which is, well, if you look at reserve water rights, this can turn these into public lands and actually make these part of the park. And there's nothing in ANILCA that's a clear statement saying we are going to take the State's submerged lands, make them public lands, and actually include them in the parks. When we were here last time, we talked about when that happens, the enabling statute is very clear. And the statute that added Lake Ozette to the Olympic National Park actually specifically said we are adding the submerged lands to the parks. So you just don't like the Park Service. The Coast Guard is fine with you. The Army Corps of Engineers is fine with you. The EPA is fine. But not the Park Service. It's not that we don't like the Park Service. It's that layer of regulation that was not supposed to fly on top. Yes, Mr. Chief Justice. That's exactly right. Which sentence of Section 3103C do you think wins this case for you? The second sentence does the most work. But the second sentence needs to be read in conjunction with all three sentences and in conjunction with the context of the statute. All right. I've burned up an awful lot of gray cells trying to put together the pieces of this statute. Could you just take me through the second sentence and explain why that wins the case for you? Thank you. So the first sentence of Section 103C has just told you that any nonpublic land, whether it's State land, submerged lands or waters, native corporation or private land, it is not going to be part of the park. It's not a portion of the park. It's not a portion of the park. It may be surrounded by the outer boundaries, but it's not part of the unit. You know, whether something can be within a unit but not be a portion of the unit is kind of a nice question. I don't think there's a slam-dunk answer to that one way or the other. Would you agree? I would agree, but the Court doesn't need to reach that issue. To the second sentence, which then says, No lands which on or before December 2, 1980, have been conveyed to the State, native corporation or private person, again, shorthand, nonpublic lands. Right. They shall not be subject to regulations applicable solely to public lands within the units. And what that is telling you is not only are they not part of the unit, they may not be regulated as though they were. And that's the function of the word solely. It's distinguished between park management regulations and the regulations Mr. Chief Justice was talking about, Coast Guard, EPA. Well, how does it do that? If I just ask one more question related to this. I understand that lands is defined by ANILCA to include water and waters and interests therein. But the second sentence, after referring to lands, then refers to a conveyance, which I take it means the transfer of title. And nobody really has title to navigable waters. So what do we do with that? There are two parts to that. First of all, the submerged lands were conveyed to Alaska. The Submerged Lands Act was specifically included within the Statehood Act. Right. In terms of having title to water, this Court has in U.S. v. California and PPL Montana certainly suggested a very strong language that with the Submerged Lands Act, with title to the submerged lands and with ownership and control of all the resources within there, that is effectively title to the water. No, I mean as to the public lands. So public lands are defined the same way. They include water. Public means, I take it, title in the United States. But the United States does not have title to navigable waters. Is that right? That is definitely right, and they don't claim so here. Could I ask you to go back to the applicable? Justice Kagan. Could I ask you to go back to the applicable, regulations applicable solely to public lands, and you suggested that that language is what distinguishes Park Service regulations from, let's say, EPA regulations. But when I read that language, regulations applicable solely to public lands, it seems to be making a distinction between regulations that apply solely, exclusively to public lands, and those that apply more broadly to both public and private lands. That seems to be the distinction this makes on its face. So I guess I don't quite get how you make it into something different. Yes, and Mr. Surgeon's position, as with the State, is that solely distinguishes between the generally applicable regulations that we talked to Mr. Chief Justice about, Coast Guard, EPA, and so on, and park management regulations. If you were to take the word solely out of the statute, you would have inadvertently exempted these lands from a myriad of other federal regulations that applied before ANILCA, and that was certainly intended to apply after ANILCA. If you look, I mean, the Park Service, in its argument about section 103C, in argument go ahead. But I guess solely to public lands is like if you take out the word solely, this is saying solely to public lands as compared to what? As compared to public lands and something else, meaning nonpublic lands. And that seems to be the distinction it's drawing. Solely to public lands or to public lands and something else, nonpublic lands. The sentence needs to have meaning beyond articulating what is already true. If a regulation is promulgated only to apply to public lands, it already only applies to public lands. That second sentence has to have meaning. And if it doesn't prohibit the Park Service from issuing the exact regulation at issue here, which is a regulation designed to touch both public and nonpublic land, that sentence actually doesn't prohibit anything. It needs to have prohibitive effect. If you want to understand its prohibitive effect, you look at this came into the statute. It was not a last-minute technical addition. It was introduced in the House by Representative Seiberling a year and a half before ANILCA was passed. And he specifically said the fact that these nonpublic lands were within the units drawn on the map does not change the status of that State Native or private land. And that goes back to if you're about to surround these lands with the parks, they would already be subject to a rich matrix of Federal regulations before ANILCA. You are not going to subject them to any new array of Federal regulation merely because of them being surrounded by the park. Kagan.   Kagan.     Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. I mean, how do I have to manipulate this language to get it to mean what you want it to mean? Kneedler. I can't answer why. Congress chose those specific words. Kagan. I mean, what could you do to this language to make it more like what you are suggesting it means because I look at this language. It just doesn't say. It is just not anywhere close to what you are saying it means. Kneedler. I am – I believe ‑‑ Kagan. But maybe I am wrong about that. I really am trying – I am struggling with this. You know, the language weren't read in context with all three sentences and read in context of the statute. The meaning becomes clear. And perhaps in hindsight, they could have written something about applicable solely to land, you know, solely land management power. But what you are – solely is drawing that distinction of the regulations that only could come into play after the passage of ANILCA. And it is important to keep in mind that without provisions like Section 103C, there is no ANILCA. There are no ANILCA parks. And there was a large debate. It took two years to pass the statute. There were issues relating to the Native Claims Settlement Act. There were issues related to the Statehood Act. And it was a very large debate that this Court recognized in Amico of what lands will go into a conservation system unit and be subject to much more rigorous conservation regulations and which lands will not go into these. Did the park service have no regulatory authority over these areas prior to ANILCA? None. That is correct. Well, I mean, that seems the question to me, that the park service has a reg, imagine, that says no bonfires in Yellowstone within the boundaries of Yellowstone. There are some private enclaves within Yellowstone. But they mean no – forget it. I want you to reserve your time. I would rather you reserved your time. I will ask them. Okay. Thank you. If there are no other questions, I will reserve my time. Thank you. Good choice. Thank you, Counsel. Ms. Botstein. Mr. Chief Justice, and may it please the Court. Understanding ANILCA requires understanding remote Alaska. In most of the State, a vast wilderness that is more than twice the size of Texas, our rivers are our only roads. When Congress surrounded many of these crucial State waterways with Federal park areas, it consciously chose not to take away State control over these crucial rivers. Instead, Congress left them under State control as part of its commitment to providing adequate opportunity for satisfaction of the economic and social needs of the State of Alaska and its people. This Court should reject the park service's continuing attempts to commandeer control of Alaska's navigable waters, because that is not what Congress intended. Well, commandeer is a strong language. But what do you say for the park service's argument that with respect to their reserve water rights and so on, that you would be creating a checkerboard sort of situation where the park service has authority with respect to some areas but not others along the river? It is true that within these park areas, there are areas of mixed jurisdiction. Congress absolutely knew that, both because it created islands of private and native corporation land that were beyond the reach of park management regulation, and similarly with the waters. And that's consistent with the default way that water management is done. I mean, PPL Montana mandates a segment-by-segment navigability analysis. So even along large waters, there is a mixed jurisdiction. Well, what authority would you say that the park service has? I mean, you're asserting authority with respect to the river. The park service, apart from inholdings, has authority with respect to the land. How do you resolve the conflicts that are inevitably going to arise? What Congress did was mandated cooperative management as a primary management tool in these parks.  In part, Justice Sotomayor asked, how can the park service fulfill its statutory mission if it doesn't have title to all the lands and the waters? What Congress said is, you work together and create a management plan for each area, identify areas of concern on public and nonpublic land, and work with landowners and the State of Alaska to try to cooperatively resolve those conflicts, because Congress knew it wasn't giving sole and exclusive jurisdiction to the Federal Government. If there's any doubt about that, Your Honor ---- I think you've answered my question. How is the government, the Federal Government, supposed to fulfill its statutory duties? There are many rivers here that they're given explicit obligations. You're basically saying 103C trumps that. It doesn't make much sense to me if a statute tells the government, do this, and at the same time reserve some rights to the State. Doesn't the Federal Government's obligation to do this, the explicit obligation to deal with certain rivers in a particular way, trump any other exemption that you might have? No, Your Honor, because the statutory mission is limited to regulation on the public lands, on the Federal lands. Congress reserved State lands, nonpublic lands, to Alaska private landowners or native corporations. Another way to think ---- I'm sorry, just that's not true. Many of these rivers are specifically named in the statute. Yes. And your position or your co-counsel's position is that all of these rivers belong to the State. The navigable rivers that were State, that were not Federal in ownership that passed to the State under the Submerged Lands Act, yes. Well, we have a problem with whether you can own navigable waters, but that's a different  issue. What Congress did, Your Honor, was said ---- you know, when Congress names the rivers as part of a watershed, in part what it's saying is on the public lands, your statutory mission is to regulate in a way that protects these watersheds, protects access to the watersheds, protects the watersheds, but at the same time, it is the State that has jurisdiction over the water themselves. And if there's any doubt about this, if you look through Title 16, when Congress created different national parks, it used vastly different jurisdictional language. When Congress created Yellowstone, which Justice Breyer mentioned, this is what it said, "...the Yellowstone National Park, as its boundaries now are defined, or as they may hereafter be defined or extended, shall be under the sole and exclusive jurisdiction of the United States." That's a very clear statement that says we drew a circle and everything within it is Federal. The Park Service can manage it. It does violence to Congress's differing intent to interpret Section 103C to mean the same as what sole and exclusive Federal jurisdiction. And Congress had very good reasons for giving Alaska more sovereign power, reserving more sovereign power to Alaska than it did to Wyoming, because this statute is not a pure conservation statute. This is also a statute that fulfills the promises made to Alaska at statehood and in the Native Claims Settlement Act about local control and self-sufficiency designed by Alaskans. Sotomayor, I'm having a hard time accepting your position in this case with your position  that I don't know how we can give different meaning to public lands in two provisions of the same act. Your Honor, giving effect to Congress's intent in ANILCA does may require preserving the rural subsistence priority in Title VIII of the legislation, even if it does require a different statutory definition. Now, no party has challenged the current Federal subsistence regulations. The briefing certainly reflects this is an issue of great concern to the people of Alaska and its rural residents, and the Court should not upset those settled expectations of Alaskans today. A different definition in these titles does reflect Congress's very different intent in Title VIII. Title VIII could have been its own statute. It has its own statement of purpose. It has its own – it is the only place in this extensive law where Congress specifically exercised its commerce power, and it has a Federal takeover provision that says Congress was so concerned that there be an enforceable subsistence priority that it gave explicitly the Federal Government the right to regulate that if the State could not, which is how it played out. So we don't think the Court needs to resolve this issue today, but we do ask that the Court leave some space open for those to be differently interpreted in accordance with Congress's intent. Sotomayor, if one defines them the same, but not in accordance with your views, but in accordance with the government's current view and the Katie law decision's view, then you don't win here. The statute does contain one definition. We have cited to the Court in our brief cases that do suggest in these long, complicated statutes we do look to Congress's intent and the context of the statute, and that can mean that a term does have different meaning in different sections when that is what Congress intended. Sotomayor, so why isn't all of the references to the government's control of rivers in this Act a similar statement of purpose? Because those need to be read in the context of 103C, which doesn't say the Federal Government can come in and regulate these rivers if we don't know how else to do it. Or regulate subsistence living, but you're arguing that the purpose of the statute is reflected in its structure and words, and the structure and words here are giving the government defined statutory duties for any number of rivers within this compound. So I don't see the difference in the logic. Your Honor, the statutory duties that the Park Service is given is delegated to the State to regulate for non-subsistence purposes is limited by Section 103C, and that is a meaningful restriction. You agree with the Katie John decisions, correct? We are not challenging the Federal subsistence management regulations that are implemented by the State. Do you – does the State of Alaska agree with those decisions? Your Honor, the reasoning of those decisions may be appropriate to – for the limited purpose of effectuating Title VIII, but should not be expanded to change the Federal Reserve Water Rights Doctrine throughout the circuit for all purposes. And certainly, Congress had good reasons for treating Alaska differently than other States in the main body of the statute, because this comes back to the Congress's special solicitude for Alaska and its uniqueness, which are concerns this Court spoke about in its 2016 opinion. This is not a situation where we're talking about tourists who might be disturbing a wilderness area. This is a situation where people are living and working along these rivers and using them for transportation, for commerce, for fishing, and these are exactly the reasons that States were given – if I may finish my sentence, Your Honor. Sure. These are exactly the reasons that States were given control of their submerged lands under the Submerged Lands Act, and Congress wanted to effectuate those purposes in this statute. Thank you. Thank you, counsel. Mr. Kneedler. Mr. Chief Justice, and may it please the Court, I'd like to identify at the outset two statutes that have not been discussed, which we think are very important to understand the provisions of ANILCA at issue here. The first is a general statute enacted in 1976 and added to the Park Service's General Authorities, which is reproduced in our – in our brief at page 8A, and it says the Secretary, under such terms and conditions, et cetera, will have the authority to issue regulations concerning boating and other activities on or relating to water located within system units. That is a general authority, contrary to Petitioner's argument, that specifically delegates to the Park Service, along with the Coast Guard power, to regulate navigable waters in the national park system. So the question here is whether that was somehow abrogated when it comes to Alaska, and I think the answer to that question is in another provision that is not mentioned. Before we get to the abrogation question, I'd just like to understand your argument on the terms of the 76 Act itself a little bit better. It says the Secretary may prescribe regulations concerning boating and other activities on or relating to water within system units. And I'm paraphrasing, but I think that's about it. And I'd understand your argument better, I think, if the statute read that the Secretary could regulate water in or relating to system units. So not just water within system units, but also water outside system units, like the water here, that might have some downstream effect, say. But that's not what the statute says. It says that the State may prescribe regulations concerning boating or other activities that themselves relate to water in system units. So I would think that the government would have to prove some nexus between boating or the other activities and the water within the government's system units. And I just didn't see that story told here, how Mr. Sturgeon's hovercraft would in some way impact water within the system units, meaning public lands, public waters. So if I could answer that, that I think does go to the abrogation question. This is a general statute that applies within the unit. No, I'm asking whether you even qualify under this statute before we get to abrogation. Yes. Well, I think under they are located within the outer boundaries of. Within the outer boundaries, but not necessarily, we know from Anilco, within the unit itself. Well, that goes directly to the. Okay, but assume for the moment that I'm persuaded that it's not within the unit. Okay. And that you have to rely on relating to the unit. All right. What's your argument then? Well, non-navigable waters. I mean, first of all, we're talking in this instance about a river that runs through Federal lands on both sides. And it's been determined to be navigable. But it is within the Federal bounds. Okay. If I don't buy that argument, then do you have anything left? Well, it would affect the non-navigable waters within the area. There could be stretches of the river that would be non-navigable under this Court's decision in PPL. I guess that doesn't help me either. I'm wondering whether you have any argument that the use of the hovercraft outside the system units, boating activity outside the system unit, premise me, work on that premise, would have any effect on the water within the system unit? Well, it has, a hovercraft could have, they're very loud, they're unsightly. And I don't read this to say that the effect has to be on the water. The purpose of giving the regulation, regulatory authority to the park service is to enable it to fulfill the purposes of the park as a whole, not just the water. Do we know from the record that the hovercraft could be heard within the system unit itself, let alone seen? Well, there were Federal lands on both sides of the water. So as when operating, I think it could surely be heard on the lands. But if I could go to the second statutory provision I wanted to cite, this is in 410HH-2 that we cite in our brief, again, against the backdrop of the 1976 statute. It says, The Secretary shall administer the lands, waters, and interests therein added to existing areas or established by the foregoing sections of ANILCA, the one that lists the parks, in accordance with the Organic Act as amended and supplemented. In other words, in accordance with the General Authorities, which includes the 1976 Act. This provision, far from abrogating the Secretary's authority, confirms that with respect to the waters that were added to the parks, to the park system, the Secretary can invoke the 1976 Act. Breyer. Your point here, which we'll hear something about probably at rebuttal, is that there are some other statutes here that whatever it says in 103C, give direct authority to the Secretary to do this. I see where you're driving at. But I'd like to go back to 103C, because the question that Justice Kagan asked was a question that was in my mind, too. And it is to do with the word solely. And either they can or he can answer this on rebuttal, too, if he wants. Imagine something like Yellowstone, not perfectly, but it's a square. And it is mostly, it's Federal, but there are a few houses belonging to Smith & Jones that are private. And the pass of statute, reg, and the reg says no bonfires within the boundaries of the park, which means Smith can't do it either. Now, is that a reg that is a reg solely relating to lands to which the U.S. has title? Well, I can, the argument that it couldn't possibly be for the purposes of this statute is you wouldn't need, you wouldn't need sentence 2 at all, if that were the case. You just wouldn't need it, period, because it wouldn't apply to the river regardless. Because it says it wouldn't. Okay? So, sentence 2 must have some purpose. And therefore, when the national park system has a reg which says applies within the boundaries of a national park, that is a rule that relates only to public lands. And if it doesn't, say, without that, this is meaningless, and so it must mean that, and so it must be that that kind of thing is what you can't do to enclaves within public lands in this area. And the river is such an enclave because it is not a piece of property to which the United States has title. Now, that, I think, is their argument. I've had a hard time grasping the arguments in this case, but I think that that is their argument. If I am right, what's the answer to it, if there is one? There are a number of answers to that, and there are several respects in which 103C, the second sentence, is inapplicable. Perhaps the most basic is the fact that 103C, that second sentence, refers to no lands which have been conveyed to a State. The Submerged Lands Act conveyed to the State only submerged lands and interests in waters. It did not convey the waters themselves. And so that the second sentence of 103C does not affect the Park Service's regulation of navigable waters. Breyer. I got that one. Is there another one? Because that one, I don't know, water is stuff you could convey, and I don't know. All right. But is there another one? No. Just, if I could just finish that point. I'm not going to. No. That's critical to the point I was making before, that the 1976 Act is one of general applicability, specifically giving the Secretary the authority to regulate waters, including navigable waters. And the other statute I mentioned specifically says that the Secretary may regulate the waters added to these park units according to the general authorities, which includes the 76 Act. And that ties directly to the fact that the waters, the navigable waters, were not conveyed to the State, and therefore the Secretary's regulatory authority over such waters is not affected at all by the statute. Sotomayor, can I ask the question in reverse? What can't you do? Under your reading of this statute, what sorts of regulations can't you pass? Because if you can identify a permissible and impermissible, you're giving meaning to this. If you don't, you're basically saying there's no meaning. And I think it may be useful to distinguish two different types of non of land not owned by the United States. The one were the inholdings. The issue here that was different about Alaska was that within the outer boundaries, there were lands selected by the State or selected by native corporations, and Congress did not want them to be administered, just like the park service lands, it wanted them to be set apart. And that is what the legislative history that the other side refers to was all about, was preserving the ability of the native corporations to use the large tracts of land that they had selected. It was not about navigable waters. That's the other category at issue here. And, again, the State only owns the bed. It's an established principle of navigable waters. I haven't yet heard an answer to Justice Sotomayor's question when it comes to water. Does the government claim plenary authority over all waterways in Alaska? No, we're only talking here about navigable waterways within national parks. Right, but everything relates. All waterways are connected. And you say it's not just the waterway but anything related to the waterway that you own or that you claim to have land on both sides of. So where is the limit? It's well established under the navigational servitude, and, in fact, the Submerged Lands Act preserves to Congress the ability to regulate in the interest of commerce. So it's plenary. It's plenary then, right? It's pretty close to plenary, but this Court has recognized that there is — but the Secretary hasn't exercised it to that degree. But this Court has recognized in cases involving navigable water that the fact that the State owns the submerged lands does not interfere with Congress's ability to regulate the waters themselves. The Water Act, for example. The navigational servitude. I mean, that's really about if Alaska decided to, you know, build a bridge across the river and things like that. I don't know that it reaches as far to justify any type of regulation on the water. Well, Congress regulates, again, outside of parks, regulates extensively navigable waters for dredging and filling, for Clean Water Act, for pollution. No, no, all sorts of things. And that's, as the State reads it, and the private party, that's what the Soli is for. They agree that the Clean Water Act applies. They agree that the navigational servitude applies. I think they agree that the reserved water rights apply. What they don't agree is that that is a lever that gives you authority to do the sort of day-to-day regulations such as, you know, the hovercraft traffic. Well, you may think a hovercraft is unsightly. I mean, if you're trying to get from point A to point B, it's pretty beautiful. Well, there are a number of instances within the act in which Congress has specifically required the Secretary to accommodate, to take into account what's different about Alaska by requiring it to accommodate methods of transportation, like air. We mentioned boating. The fact that the Secretary is permitted to regulate boating only subject, only reasonably, means that he can regulate boating, means the National Park Service can regulate boating on waters within the park. Sotomayor Can I summarize what I think you said? Are you saying that 103C, basically because of the navigational servitude, the other regulations you pointed to, doesn't permit the government to regulate activities on the territorial lands or on the submerged lands, but it does give it basically plenary authority over navigable waters? I hesitate to say plenary. I think it gives it, it preserves for the, through the Park Service, whatever the scope of authority that Congress would have or the Federal Government has over navigable waters. The uplands are very different. So you're basically saying whatever the regulations were under the Oregonic Act or even under this Act and charging you with taking care of certain parks, that the navigable waters are part of that charge? Yes. The uplands are different, and that's really what drove 103C, was to make sure that these land selections were not going to be subject to the general regulations of the Park Service. And, in fact, that's been exactly true. There are really only three sets of regulations that the Park Service has applied in, outside of federally owned lands. One is the regulation of navigable waters pursuant to an express statutory authorization in the 76 Act. The other two have to do with the regulation of solid wastes pursuant to specific statutory directives to regulate within the boundaries of National Park units, just like this statute talks about within system units. And the other is mining in areas of the National Park System, which the Park Service has applied regulations there, all three pursuant to specific statutory directives. The Park Service has not done more than that. So you think the State's argument works with respect to solid land, land land? Well, there is. It's only because you don't think that water is included in public lands that their argument doesn't work. No, well, it's because. It's only because it is water. Water was not conveyed to the State. That's the first argument. The second argument is if you have a regulation that, in the examples I mentioned, regulations issued pursuant to statutory directive to apply to both public and nonpublic lands within the National Park, that comes within the reference, they are not regulations applicable solely to public lands in the Park. That's one of your arguments that causes me concern, because you're saying that if the regulation applies to the private or State land, then it is not a regulation solely applicable to public land, and therefore it's not covered. But the sentence is obviously designed to protect the State, the natives, and the private landholders against the Federal Government or the Park Service, to whatever extent we can debate. But to say that all the Park Service has to do to get around it is say, oh, and this applies to the inholdings, that can't be right. Well, I'm not saying – I'm not – in fact, I would disclaim the proposition that the Park Service could treat them as the same way it treats regular Park Service lands. It cannot do that. And the only examples where it has issued regulations that go beyond that are pursuant to specific statutory directive, of which the 1976 Act regulating waters is one.  Kagan's argument is that non-public lands shall not be subject to regulations that are applicable only to public lands. And you don't need a statute to tell you that. Of course non-public lands aren't subject to regulations applicable solely to public lands. If that's what the statute was saying, who would need a statute? Well, I think the purpose of the statute, and again, I think this comes through in the legislative history that is cited on the other side, the native groups were concerned, as was the State, that because large tracts of land that they had selected were going to be included within the – in the – within the outer boundaries, that they were not going to be – that they would be treated just like – they wanted assurance that they wouldn't be treated just like Park Service. And that's what this did. It's important to recognize that this is subsection C of a section that deals with maps. It isn't – it doesn't – you would think if there was some major substantive change work that this was supposed to do, aside from the substantive regulations, it would appear elsewhere. And there may be – I think there's a – But if just on the face of things, Mr. Kneedler, if the Park Service issues a regulation and the regulation says this applies only to public lands within a park, right, and you're not a public land within a park, you're a private land within a park, what kind of assurance do you need? It's like you know that you're not a public land, so it doesn't matter that you're in the park. You don't need a special statute to tell you that, do you? You only need a special statute if the special statute exempts you from something that would otherwise apply to you. With all respect, I don't think that's correct. I think that the – I think that there was a lot of debate about – about different versions of the statute. And I – and I think if you – if you recall, as I said, this was in a section dealing with maps, and the statute required that the – that the – that the boundaries that maps be published identifying what the parks were. Those maps might have, and in fact I think did, just outline the outer boundaries. And so the subsection C says, well, yes, that – that may be the boundaries of what was designated, but we want to be clear that it's only – it's only the public lands that will be deemed to be portioned by the way that that's written about. Roberts, Jr. about the third sentence? I mean, you're trying to minimize it by saying it's maps. The third sentence has to illuminate the first two. And what it says is, if the State, a native corporation, or an owner wants to convey lands to the Secretary, it can. In other words, if you, the Secretary, feels that you need to have authority over areas that you don't, it tells you in the third sentence how to do it. Get the State or the native corporation to convey it to you. That would be an odd sentence to include if this were not – if this were a protection you could write around just by saying, oh, and by the way, this applies to the inholders. No, I don't think so at all. I mean, I think this provision was in there because if you had native or State-selected lands or native lands, the native corporation, they were – if they decided to sell their land, this just says that the Park Service could purchase it. But if you claim that it's – Let me go back to this question, because this is obviously the question that's bothering some of us, okay? And it seems to me you've sort of answered it both ways. You're not – I started out thinking that if a reg applies to Mr. Smith's inholding in Yosemite, because it applies to all of Yosemite, that that is solely public lands. Why? Because if the only things that count as a reg for public lands – we've said this three times – are, are. Those regs that say they don't apply to Smith's inholding, you don't need this statute. Okay? That's the basic thing. Now, some of what you said seems to agree with that, and some of it does not. But what I took your basic arguments to be, one, that water, unlike Mr. Smith's cabin, is close enough to public lands that it's out of this thing. Two, even if it doesn't, there are other statutes that give specific authority to the government to regulate the water. And one of them might be general, one of them might be the ones you just started off your argument with, one of them might be, I don't know, there are two or three on that. Now, I think I've got this very helpful argument right, at least of what you're arguing. And is there something else, or do I have it so wrong it's hardly worth answering? Kneedlerer No. I think it's basically correct, but there is the category of regulations that are not applicable solely to public lands because they have been made applicable to inholdings within the Park Service. Whether or not that's valid in any particular case is a different matter, but there are three, as I mentioned, that were done pursuant to statutory authorization, and those, I think, must be valid because Congress has authorized them. But that is not really involved here. Here we're only talking about waters which are not in the legal system. Roberts Thank you, Chief Justice. I just wanted to ask you a question about implied reserved water rights. In the cases where we have dealt with that, the government has been asked to show in detail the purpose of the reservation and the volume of water that's necessary to achieve that purpose. Do you have to make any kind of showing like that here? Kneedlerer Well, in the 1999 regulations that Congress allowed to go into effect, the Park Service, by rule, identified the Park Service units or areas added or expanded by ANILCA in which there were reserved water rights. And when you look at the purposes for which these units were established, it's clear that water was a central purpose of them. In fact, the one we have here is the Yukon-Charlie Rivers National Preserve, and it specifically defines as one of the purposes to preserve the entire Charlie River Basin, including streams and lakes. So that clearly identifies the protection of the integrity of those waters and the scenic values associated with them. That's why we have national parks. That's why we have this national preserve. So I think it's clear that water is reserved for the purposes of these reservations, every one of which either refers to specific bodies of water or to aquatic activities such as fishing or boating or access. Alito So what has been reserved here is plenary authority for the Federal government to regulate the navigable waters. Kneedlerer The extent of the Ninth Circuit's opinion in KD John 3 makes this clear. The extent or even, frankly, the existence at a particular location of a reserved water right has not been decided. If there's an adjudication down the road that the reserved water right does not extend to some stretch or another area, that could be resolved. But what the Interior Department had to do in light of the KD John decisions was to identify the areas that, for the time being, in its view, were subject to reserved water rights. Alito No, I wasn't asking about the geographical limits of it. I'm asking about the regulatory limits as to what are, for which there is a reserved right the Federal government, the Park Service can do, can regulate completely, as it, is that right? Kneedlerer I wouldn't, I think within the National Park system, it overlaps with the 1976 statute that I mentioned, which I think directly, you don't have to go through the reserved water rights approach to get there. Within National Parks, the KD John subsistence use could have been satisfied by relying on the 1976 Act and not relying on reserved water rights. And all we have here are navigable waters within National Parks. But, no, I, the extent of what regulatory power might be triggered would be different. If I could go back to the Justice's question. Alito Could I just slip in one more question, since you referred to KD, to KD John, and ask you the same question that was asked of counsel for Alaska. If we were to rule against you here, would that necessarily mean that the KD John decision was incorrect? Kneedlerer I would certainly hope not, but, I mean, I think Petitioners have a, Petitioner and the State have a difficult argument, because the KD John and the regulations implementing it, once the Congress specifically allowed to go into effect with full knowledge that KD John was out there, it turns on the definition of public lands, which is a term that runs throughout the Act, which is, we think, a good reason why, why it should be upheld. At the very least, KD John demonstrates the importance of Federal regulation of waters within these areas, in that instance for, for subsistence uses. If I could just finish the answer about sentence 3 of 103C. One of the things the Park Service could never do is grant access to private lands. The Park Service not only regulates things that you can't do in National Parks, but things that they have to allow, like access, camping, picnicking. Well, obviously, the Park Service cannot allow people to have private, have access to the private inholdings. So one of the reasons why the Park Service might want to acquire the adjacent lands or the inholdings would be for the purpose of allowing public access to those areas. But I also want to underscore that there are so many provisions of ANILCA that specifically refer to water and, in fact, the regulation of water. One of the ones I mentioned, 3170A, specifically allows the Park Service to regulate boating in, in these areas. That picks up on the 1976 Act, the general application that is made specific here by allowing regulation of boating. There's 3121B, which requires access for subsistence units, their uses. There's the Wild and Scenic Rivers Act, which the whole purpose of designating a river within these National Parks is to preserve the river. But this says that the Park Service has plenary authority over all the navigable rivers within the Conservation System Unit, nor is there any indication by any member of Congress of such a authority. Well, I mean, putting to one side whatever we might mean by plenary, the 1976 Act specifically gives the Park Service authority over water. But this would have been a, sorry to interrupt, this would have been a huge deal for the people of Alaska and the representatives from Alaska to accept full or close to full Park Service authority over all the navigable rivers, yet. To the contrary, I see no indication in that, and this 1410HH2 that I mentioned specifically says that the waters added to these areas are subject to regulation under the Park Service's general authority, which includes the 1976 Act. I think the extraordinary thing would be to say that the Federal Government through the Park Service did not have the authority to regulate navigable waters, not just any navigable waters, but navigable waters in park areas set aside for the very purpose, often express purpose, of preserving the values of the rivers and lakes and streams that were in their midst. This is a very water-centric statute, and I think it would turn it upside down to say that Congress, of all things, was incapable of regulating the navigable waters within the park system. Roberts' Well, but I mean, the waters are very important to the Alaskan way of life and the way they aren't elsewhere. And I guess the argument on the other side, it would be pretty extraordinary if you go to the trouble to say you only can regulate lands with respect to which you have title, and you say from that you get the authority over the rivers, even though title in the submerged lands is in the State. Well, our argument doesn't depend on the title question or control over navigable waters, but the title question is involved on the Katie John rationale. But on the point you mentioned, ANILCA itself embodies the compromise or the balance of the competing values. In most parks, you can't hunt. Hunting is permitted in national preserves, including this one. In most places, you can't have airplane use. Well, here you are allowed to have airplane use. There are specific provisions for access to in-holdings, something that you don't normally have in other national parks, but because there were in-holdings, there are provisions for that. There's provisions for boating and other access to subsistence uses. The very things that make Alaska different are accommodated in this statute. But one of the things that is not different about Alaska is the importance of the Federal Government having control over the navigable waters that are the centerpiece of the parks. What is different about Alaska is the large tracts of in-holdings, which is really what the focus of 103C was. And in that situation, only in very limited circumstances has the Park Service ever applied regulations that go beyond simply the public lands to embrace the broader system of lands. And again, this is the Yukon-Charlie Rivers National Preserve. It would be extraordinary to conclude that the Park Service, without some express statement to that effect in the statute, could not regulate it. And as I say, this statute giving it the authority to regulate waters is explicit on that point. Roberts. Thank you, counsel. Five minutes, Mr. Findley. Yes, thank you. Counsel several times cited the provision of ANILCA saying these parks and preserves shall be governed in accord to the Organic Act. Counsel forgot to finish the provision of the statute that says, and as amended or modified by ANILCA. So every time they refer to the Organic Act, they have to read it together with ANILCA. And you have to read it with Section 103C at the very front of the statute. It's a linchpin, and it's foundational. And what it's designed to do is say, if the federal government doesn't have title, it's not public land, and it's not part of the park, and it's there to prevent the land that it's not part of the park. But the problem is you don't have title to the water. I mean, you suggest that there are some cases who say effectively it is, but effectively is different than is. Navigable waters are navigable waters. We rarely think of them as someone having title to them. But we do think of them as having interest in them. And if there's two interests, the federal government and the states, don't they win? Because if they have an interest, they have a public interest that by statute is being directed. I mean, there are 26 rivers designated as wild and scenic rivers here. There are all sorts of, I've mentioned this repeatedly, all sorts of statutory obligations that the government is being given under this particular act to preserve these waterways in a particular way. So I don't understand. If you don't have title, does this, at least with respect to navigable waters, do you have any claim whatsoever? What matters here is that the United States does not have title to those waters and does not have title to the submerged lands. Once that's the case, they aren't public lands, they aren't part of these units, and the Park Service may not use its Organic Act authority to reach out and regulate them. You asked the Park Service early on, a very foundational question, what does 103c prohibit in your view? And 20 minutes later, there was no answer from the Park Service. The reality is, in their view, any time they feel it is necessary or appropriate to regulate outside the boundaries of public lands, they feel they can do that. Now they feel, well, we haven't done it that often, but this is exactly what section 103c was designed to prevent. They are looking at 751b, go ahead, sorry, I thought I heard a question come in, and they're looking at 751b and they are relying on that phrase, activities on or related to water, to justify regulating water that is not part of the unit, and there's no limiting principle to that. Activities on or related to water could very easily be read as activities taking place on native corporation land within the unit. All of that is extraterritorial regulation, that is what section 103c was specifically designed to prevent, so every time the Park Service wanted to promulgate a regulation to reach out to non-public land that is not part of the unit, the state of Alaska, a native corporation or a private party did not have to go petition to court and say, please don't do this. That was the central deal of ANILCA. And the waters were as crucial to that as the native corporation land and the other very clear, and for the state of Alaska, the rivers are the roads, and while the act constantly references rivers and waters, you need to give effect to both dual balancing that Congress was doing. By adding over 100 million acres of land, public land to these units, you are achieving significant protection of the waters and you're also protecting all waters where the state does not own the submerged lands. So regulation of those public lands indeed protects the waters. What we are talking about here is the state's authority to retain primary control over the use of its rivers that run by the parks and are surrounded by the parks. The federal government, of course, retains control of the rivers. As we've talked about, the Clean Air Act applies, Coast Guard regulations apply, federal criminal law applies. These rivers are already significantly protected. The hovercraft rule, come back to what brought us here today, why is that rule there? It's not there to protect the quality of the river. It's there because of sound, and it's there because the Park Service wants to restrict access to remote areas of the parks, while the state of Alaska has a very different view about access to the remote areas of the state, and that's a judgment call that ANILCA should leave to the state of Alaska. Thank you. Thank you, counsel. The case is submitted.